Richard D. McCune (State Bar No. 132124)
rdm@mccunewright.com
Jae K. Kim (State Bar No. 236805)
jkk@mccunewright.com
MCCUNEWRIGHT LLP
2068 Orange Tree Lane, Suite 216
Redlands, California 92374
Telephone: (909) 557-1250
Facsimile: (909) 557 1275

THE KICK LAW FIRM, APC
Taras Kick (State Bar No. 143379)
(Taras@kicklawfirm.com)
G. James Strenio (State Bar No. 177624)
(James@kicklawfirm.com)
Robert J. Dart (State Bar No. 264060)
(Robert@kicklawfirm.com)
201 Wilshire Boulevard
Santa Monica, California 90401
Telephone:  (310) 395-2988
Facsimile:  (310) 395-2088

Attorneys for Plaintiff Sondra Ramirez
and the Putative Class

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SONDRA RAMIREZ, individually, and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>BAXTER CREDIT UNION and DOES 1 through 10,<br><br>Defendants. | **Case No.:**<br><br>**COMPLAINT FOR:**<br>**(1) Breach of Contract;**<br>**(2) Breach of the Implied Covenant of Good Faith and Fair Dealing;**<br>**(3) Unjust Enrichment/Restitution;**<br>**(4) Money Had and Received;**<br>**(5) Violation of the Electronic Fund Transfer Act**<br>**(6) Violation of the California Unfair Competition Law (Cal. Bus. & Prof. Code § 17200).**<br><br>**CLASS ACTION**<br><br>**DEMAND FOR JURY TRIAL** |

1

1

## COMPLAINT

2       Plaintiff Sondra Ramirez ("Plaintiff"), by her attorneys, hereby brings this class and

3   representative action against Baxter Credit Union and DOES 1 through 10 ("BCU" or "Defendant").

4                               ## NATURE OF THE ACTION

5       1.      All allegations herein are based upon information and belief except those allegations

6   which pertain to Plaintiff or her counsel.  Allegations pertaining to Plaintiff or her counsel are based

7   upon, inter alia, Plaintiff or her counsel's personal knowledge, as well as Plaintiff or her counsel's own

8   investigation.  Furthermore, each allegation alleged herein either has evidentiary support or is likely to

9   have evidentiary support, after a reasonable opportunity for additional investigation or discovery.

10      2.      This is a class and representative action brought by Plaintiff to assert claims in her own

11  right, and in her capacity as the class representative of all others persons similarly situated, and in her

12  capacity as a private attorney general on behalf of the members of the general public.  BCU wrongfully

13  charged Plaintiff and the class member overdraft fees.

14      3.      This class action seeks monetary damages, restitution, and injunctive relief due to BCU's

15  policy and practice of assessing an overdraft fee on transactions when there was enough money in the

16  checking account to cover (pay for) the transactions presented for payment.  The charging for such

17  overdraft fees breaches BCU's contract with its customers, who include Plaintiff and the members of the

18  Class.

19      4.      The charging for such overdraft fees also violates federal law.  Because BCU failed to

20  describe its actual overdraft service in its opt-in notice (because the language in its opt-in notice

21  describes an overdraft service that assesses overdraft fees based on the ledger-balance method as

22  opposed to the available-balance method actually used by BCU), Regulation E (12 C.F.R. §§1005.17 *et*

23  *seq.*) of the Electronic Fund Transfer Act (15 U.S.C.A. §§ 1693 *et seq.*) prohibited BCU from assessing

24  overdraft fees for automated teller machine (ATM) and non-recurring debit card transactions (12 C.F.R.

25  §1005.17(b)(1)(i)), but BCU did so anyway.

26                                  ## PARTIES

27      5.      Plaintiff is a resident of Hayward, California, and was a member of BCU at all times

28  relevant to the class action allegations.

1    6.    Based on information and belief, Defendant BCU is a state chartered credit union with

2  branch offices located throughout California, including at least one branch in Fremont, California.

3  Based on information and belief, BCU also has branch offices in Illinois.  BCU is a "financial

4  institution" within the meaning of Regulation E (12 C.F.R. § 1005.2(i)).

5    7.    Without limitation, defendants Does 1 through 10, include agents, partners, joint

6  ventures, subsidiaries and/or affiliates of BCU and, upon information and belief, also own and/or

7  operate BCU branch locations.  Each of Defendants Does 1 through 10 is a "financial institution" within

8  the meaning of Regulation E (12 C.F.R. § 1005.2(i)).  As used herein, where appropriate, the term

9  "BCU" is also inclusive of Defendants Does 1 through 10.

10    8.    Plaintiff is unaware of the true names of defendants Does 1 through 10.  Defendants Does

11  1 through 10 are thus sued by fictitious names, and the pleadings will be amended as necessary to obtain

12  relief against defendants Does 1 through 10 when the true names are ascertained, or as permitted by law

13  or by the Court.

14    9.    Whenever reference is made in this Complaint to any act, deed, or conduct of Defendant,

15  the allegation means that Defendant engaged in the act, deed, or conduct by or through one or more of

16  its officers, directors, agents, employees, or representatives who was actively engaged in the

17  management, direction, control, or transaction of Defendant's ordinary business and affairs.

18    10.    As to the conduct alleged herein, each act was authorized ratified or directed by

19  Defendant's officers, directors, or managing agents.

20    **VENUE AND JURISDICTION**

21    11.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §

22  1332(d) because: (1) the claims of plaintiffs aggregated together exceed $5,000,000, and (2) some

23  putative class members are residents of different states than Defendant.  This Court also has subject

24  matter jurisdiction under 28 U.S.C. § 1331.

25    12.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) because Defendant is

26  a resident of this District and a substantial part of the events and/or omissions giving rise to the claims

27  asserted herein occurred in this District.

28  ///

1

## FACTUAL ALLEGATIONS

2  **A.     BCU's Unlawful Charges of Overdraft Fees**

3          13.     BCU is a credit union with branch offices throughout California with approximately $2.5

4  billion in assets.  BCU offers its consumer banking customers a checking account.  One of the features

5  of a BCU checking account is a debit card, which can be used for a variety of transactions including the

6  purchasing of goods and services.  In addition to receiving a debit card, other features of a BCU

7  checking account include: the ability to write checks; withdraw money from ATMs; schedule

8  Automated Clearing House (ACH) transactions (certain recurring payments); and other types of

9  transactions that debit from a checking account.

10         14.     In connection with its processing of debit transactions (debit card, ATM, check, ACH,

11  and other similar transactions), BCU assesses overdraft fees to customer accounts when it determines

12  that a customer's account has been overdrawn.

13         15.     Overdraft fees constitute the primary fee generators for banks and credit unions.  In 2009

14  alone, banks generated an estimated $37 billion from overdraft fees on debit purchases and ATM

15  transactions.  While credit unions portray themselves to customers as more overdraft and fee friendly

16  than banks, a 2015 study conducted by Moebs Services confirmed that the median overdraft fees

17  charged by credit unions are not statistically significantly less than the median overdraft fees charged by

18  banks.  For credit unions such as BCU, overdraft fees are a major source of revenue and a profit center.

19  According to a 2010 report by Georgetown University Law Professor Adam Levitin, overdraft fees

20  comprise 6 to 7% of the gross revenue of credit unions.  (Filene Research Institute Report, Overdraft

21  Regulation A Silver Lining In The Clouds?  Filene Research Institute 2010).

22         16.     The high cost of an overdraft fee is usually unfairly punitive.  In a 2012 study, more than

23  90% of customers who were assessed overdraft fees overdrew their account by mistake.  (May 2012

24  Pew Charitable Trust report entitled "Overdraft America: Confusion and Concerns about Bank

25  Practices", at p. 4).  More than 60% of the transactions that resulted in a large overdraft fee were for

26  less than $50.  (June 2014 Pew Charitable Trust report entitled "Overdrawn", at p. 8).  More than 50%

27  of those who were assessed overdraft fees do not recall opting into an overdraft program (*id.* at p. 5), and

28  more than two-thirds of customers would have preferred the financial institution decline their transaction

1     rather than paying the transaction into overdraft and charging a very large fee (*id*. at p. 10).

2        17.     Unfortunately, the customers who are assessed these fees are the most vulnerable

3 customers. Younger, lower-income, and non-white account holders are among those who were more

4 likely to be assessed overdraft fees. (*Id*. at p. 1). A 25 year-old is 133% more likely to pay an overdraft

5 penalty fee than a 65 year-old. (*Id*. at p. 3). More than 50% of the customers assessed overdraft fees

6 earned under $40,000 per year. (*Id*. at p. 4). Non-whites are 83% more likely to pay an overdraft fee

7 than whites. (*Id*. at p. 3).

8        18.     As a result of banks and credit unions taking advantage of millions of customers through

9 the unfair practice of charging overdraft fees through methodologies that maximize the possible number

10 of expensive overdraft fees to be charged, there has been a substantial amount of litigation over the past

11 few years. The outcome of these cases has predominantly fallen in favor of plaintiffs with the banks and

12 credit unions repaying their customers over one billion dollars for the unlawfully assessed overdraft fees

13 by way of jury verdicts and settlements.[1]

14        19.     The federal government has also stepped in to provide additional protections to customers

15 with respect to abusive overdraft policies. In 2010, the Federal Reserve Board enacted regulations

16 giving financial institutions the authority to charge overdraft fees on ATM and one-time debit card

17 transactions only if the institution first obtained the affirmative consent of the customer to do so. (12

18 C.F.R. § 1005.17 (Regulation E's "Opt-In Rule")).

19        20.     To qualify as affirmative consent, the opt-in agreementmust include, but is not limited to

20 the following:

21              •     The customer must be provided the overdraft policy, including the dollar amount

22                of any fees that will be charged for an overdraft;

23              •     The opt-in consent must be obtained separately from other consents and

24                acknowledgements;

25              •     The consent cannot serve any purpose other than opting into the overdraft

26                program;

27

28 [1] http://files.consumerfinance.gov/f/documents/CFPB_Arbitration_Agreements_Notice_of_Proposed_ Rulemaking.pdf , at p. 74-75.

1         •     The consent cannot be a pre-selected checked box;

2         •     The financial institution may not provide different terms for the account

3         depending on whether the customer opted in to the overdraft program.

4 If the financial institution does not obtain proper, affirmative consent from the customer that meets all of

5 the requirements of Regulation E's Opt-in Rule, then it is not permitted to charge overdraft fees on ATM

6 and one-time debit card transactions.

7     21.     At all relevant times, BCU has had an overdraft program in place for assessing overdraft

8 fees which is: (1) contrary to the express terms of its contract with members; (2) contrary to BCU's

9 representations about its overdraft program to its members; and (3) contrary to its members'

10 expectations regarding the assessment of overdraft fees.

11     22.     BCU entered into an agreement with Plaintiff and the class members (the opt-in

12 agreement required by Regulation E that BCU provided to Plaintiff and the class members, to which

13 BCU and Plaintiff and the class members respectively consented), which governs the terms under which

14 BCU may assess Plaintiff overdraft fees for ATM and non-recurring debit card transactions, and which

15 is referred to herein as the Opt-In Agreement. Because the opt-in agreement does not describe BCU's

16 actual overdraft service, the opt-in agreement fails to comply with the requirements of Regulation E.

17 The Opt-In Agreement nonetheless contains promises to which BCU is contractually bound. In the Opt-

18 In Agreement, BCU promised that: "An overdraft occurs when you do not have enough money in your

19 account to cover a transaction, but we pay it anyway." This promise meant that BCU is not authorized

20 to assess an overdraft fee—because an overdraft has not occurred—unless there is not enough money in

21 the customer's account to cover the transaction. By using the term "account" without a modifier, BCU

22 promises that the entire account, and not a subset of the account, will be compared against the charge to

23 determine whether an overdraft occurred. BCU's contractual promise in its Opt-In Agreement to assess

24 overdraft fees only when there is not enough money in the account to cover the item was also repeated

25 to customers in other disclosures and marketing materials.

26     23.     However, directly contrary to this promise, BCU's policy and practice is to ignore

27 whether there is money in the account or a negative balance. Instead, BCU's policy and practice is, and

28 at all times relevant herein has been, to assess overdraft fees based on an artificial internal calculation

1  called the available-balance method rather than the ledger-balance method.

2      24.    The available balance is not the customer's actual balance (ledger balance). Rather, it is

3  the actual balance of a customer's account (ledger balance) *minus* anticipated future debits (debits that

4  may or may not occur) and *minus* credit holds. Not only is the practice of using the available-balance

5  method rather than the ledger-balance method to determine whether a transaction results in an overdraft

6  and thus is subject to an overdraft fee directly contrary to BCU's Opt-In Agreement, but such practices

7  have resulted in BCU improperly charging, and continuing to charge its members, including Plaintiff

8  and the members of the Class, unlawful overdraft fees. Whether a financial institution uses the ledger-

9  balance method versus the available-balance method is a primary concern for the Consumer Financial

10  Protection Bureau ("Bureau") due to the substantial harm it causes to customers. As the Bureau

11  concluded from its studies of actual financial institutions in its Supervisory Highlights, Winter 2015, at

12  p.8[2]:

13              A ledger-balance method factors in only settled transactions in calculating an

14              account's balance; an available-balance method calculates an account's balance

15              based on electronic transactions that the institutions have authorized (and

16              therefore are obligated to pay) but not yet settled, along with settled transactions.

17              An available balance also reflects holds on deposits that have not yet cleared.

18              Examiners observed that in some instances, transactions that would not have

19              resulted in an overdraft (or an overdraft fee) under a ledger-balance method did

20              result in an overdraft (and an overdraft fee) under an available-balance method.

21  When the balance calculation method is not adequately disclosed, the Bureau has found the use of the

22  available-balance method instead of the ledger-balance method a deceptive practice, as it results in

23  "customers being misled" because this information is "material to a reasonable consumer's decision-

24  making and actions", and consumers are thereby "substantially injured". (*Id.* at p. 9.)

25      25.    BCU's practice of charging overdraft fees, even when there is money in the account to

26  cover a transaction presented for payment, is inconsistent with how BCU expressly describes the

27

28  [2] http://files.consumerfinance.gov/f/201503_cfpb_supervisory-highlights-winter-2015.pdf

1  circumstances under which overdraft fees are assessed in its Opt-In Agreement.  Further, BCU has failed
2  to inform its customers, including Plaintiff and the members of the Class, of the conditions under which
3  overdraft fees will be assessed in the Opt-In Agreement.

4      26.     BCU has violated Regulation E by charging Plaintiff and the class members overdraft
5  fees.  Because the Opt-in Agreement states that overdraft fees will be assessed only when there is not
6  enough money in the account to cover the transaction at issue, it does not describe BCU's actual
7  overdraft service.  Consequently, BCU was not authorized to charge Plaintiff and the class members
8  overdraft fees on ATM and non-recurring debit card because they do not provide an accurate "brief
9  description of the financial institution's overdraft services" as required by Regulation E's Opt In Rule.

10     27.     The importance of Regulation E is highlighted by the fact that the Bureau's study of
11  actual practices found that: 1) ATM and debit card transactions are by far the most frequent transactions
12  that occur; 2) overdraft fee policies entail expensive fees at very little risk to the financial institutions;
13  and 3) opted-in accounts have seven times as many overdrafts that result in fees as not opted-in
14  accounts.[3]

15     28.     Plaintiff and the Class members have performed all conditions, covenants, and promises
16  required by each of them in accordance with the terms and conditions of the contracts.

17     29.     Meanwhile, Plaintiff and the Class members could not have anticipated the harm
18  resulting from Defendant's practice throughout the class periods.  The ledger balance is the official
19  balance of the account.  It is the balance provided to the customer in monthly statements, which is the
20  official record of activity in the account.  It is the balance used to determine interest on deposits and any
21  minimum balance requirements.

22     30.     Further, based on information and belief, it is the balance used by BCU to report its
23  deposits to regulators, shareholders and the public.  It is the deposit balance provided to regulators in
24  call reports and reserve reports.  It is the balance used in financial reports to shareholders and the
25  balance used for internal financial reporting. It is the balance used by credit reporting agencies in
26  providing credit ratings of BCU.

27

28  [3] http://files.consumerfinance.gov/f/201407_cfpb_report_data-point_overdrafts.pdf

31.     When BCU refers to balance or funds or money in the account, it is reasonable to interpret and understand that as referring to the official balance in the account—which is the ledger balance. In its study, the Bureau concluded that when a financial institution creates the "overall impression" that it would determine overdraft transactions and fees based on the ledger balance and not the available balance, then the "disclosures were misleading or likely to mislead, and because such misimpressions could be material to a reasonable consumer's decision-making and actions, examiners found the practice to be deceptive." The Bureau further found that "consumers could not reasonably avoid the fees (given the misimpressions created by the disclosures)." (Supervisory Highlights, Winter 2015, at p.9.)

32.     Therefore, Plaintiff, on behalf of herself and all others similarly situated, seeks relief as set forth below.

**B.     Unlawful Overdraft Fees Assessed to Plaintiff**

33.     Plaintiff was harmed by Defendant's policy and practice of charging overdraft fees when there was money in her account to cover the transaction. Plaintiff entered into an agreement with BCU when she opted-in to the overdraft program with BCU, wherein BCU contracted to charge overdraft fees on certain transactions only if her account did not have money to cover the transaction. By nonetheless charging Plaintiff overdraft fees, BCU breached its contract with Plaintiff and violated Regulation E. It will be necessary to obtain Defendant's records to determine each instance of such a wrongful overdraft fee. However, to give one example, on January 16, 2016, Plaintiff had a positive balance of $347.86 in her checking account when she made a point of sale debit card payment of $60.97, leaving her with a positive balance of $286.89. Despite the fact that Plaintiff had sufficient funds in her account to cover the transaction, BCU assessed a $29.00 overdraft fee against her account that it identified as "CourtesyPymntDbt." Plaintiff has a reasonable belief that a complete review of Plaintiff's and BCU's records will show multiple instances in which BCU improperly charged Plaintiff overdraft fees for transactions despite the fact that Plaintiff had enough money in her account to cover the transactions.

34.     Moreover, the assessment and unilateral taking of improper overdraft fees further reduces the balance and amount of funds in the account, resulting in and aggressively causing subsequent, otherwise non-overdraft transactions to be improperly treated as transactions for which BCU assesses

1   further overdraft fees. This practice was deemed to be deceptive and substantially harmful to customers

2   by the Consumer Finance Protection Bureau, which made the following conclusions in its studies:

> Examiners also observed at one or more institutions the following sequence of events after the institutions switched balance-calculation methods: a financial institution authorized an electronic transaction, which reduced a customer's available balance but did not result in an overdraft at the time of authorization; settlement of a subsequent unrelated transaction that further lowered the customer's available balance and pushed the account into overdraft status; and when the original electronic transaction was later presented for settlement, because of the intervening transaction and overdraft fee, the electronic transaction also posted as an overdraft and an additional overdraft fee was charged. Because such fees caused harm to consumers, one or more supervised entities were found to have acted unfairly when they charged fees in the manner described above. Consumers likely had no reason to anticipate this practice, which was not appropriately disclosed. They therefore could not reasonably avoid incurring the overdraft fees charged. Consistent with the deception findings summarized above, examiners found that the failure to properly disclose the practice of charging overdraft fees in these circumstances was deceptive.

19   (*Infra,* Supervisory Highlights, Winter 2015, a pp. 8-9.)   A complete evaluation of BCU's records is

20   necessary to determine the full extent of Plaintiff's harm from this practice.

21        35.   Additionally, because the opt-in notice did not describe BCU's actual overdraft service,

22   BCU violated Regulation E by charging overdraft fees on ATM and non-recurring debit card

23   transactions. Because it failed to provide the full and accurate disclosures to Plaintiff required by

24   Regulation E, BCU failed to obtain Plaintiff's fully informed consent as required by Regulation E in

25   order for BCU to be authorized to charge such overdraft fees. Because BCU was not legally authorized

26   to enroll Plaintiff into the Courtesy Payment program for non-recurring debit card and ATM

27   transactions, BCU violated Regulation E when it assessed *any* overdraft fees against Plaintiff for non-

28   recurring debit card and ATM transactions.

36.     Plaintiff was harmed by this practice when she was assessed overdraft fees for
nonrecurring debit card and ATM transactions. As noted, Plaintiff's records indicate that on January 16,
2016, Defendant assessed a $29 overdraft fee against Plaintiff due to a point of sale nonrecurring debit
card transaction. Additionally, on January 4, 2016, Plaintiff was assessed at least two $29 overdraft fees
for nonrecurring debit card transactions. A complete evaluation of BCU's records is necessary to
determine the full extent of Plaintiff's harm from this practice as well.

## CLASS ACTION ALLEGATIONS

37.     The preceding allegations are incorporated by reference and re-alleged as if fully set forth
herein.

38.     Plaintiff brings this case, and each of her respective causes of action, as a class action
pursuant to Federal Rule of Civil Procedure 23(a)(b)(1), (b)(2) and (b)(3) on behalf of the following
class.

39.     The "Class" is composed of two classes:

**The Positive Balance Class:**

> **All United States residents who have or have had accounts with BCU who incurred**
> **overdraft fees when the ledger balance in the checking account was sufficient to**
> **cover the transactions in the four years preceding the filing of this Complaint.**

**The Regulation E Class:**

> **All United States residents who have or have had accounts with BCU who incurred**
> **overdraft fee(s) for ATM or non-recurring debit card transactions since August 15,**
> **2010.**

40.     Excluded from the Class is: (1) any entity in which Defendant has a controlling interest;
(2) officers or directors of Defendant; (3) this Court and any of its employees assigned to work on the
case; and (4) all employees of the law firms representing Plaintiff and the Class members.

41.     This action has been brought and may be properly maintained on behalf of each member
of the Class under Federal Rule of Civil Procedure 23.

42.     **Numerosity of the Class (Federal Rule of Civil Procedure 23(a)(1))** – The members of
the Class are so numerous that a joinder of all members would be impracticable. While the exact

1 | number of Class members is presently unknown to Plaintiff, and can only be determined through
2 | appropriate discovery, Plaintiff believes that the Class is likely to include thousands of members based
3 | on the fact that BCU has approximately $2.5 billion in assets and operates branches throughout the state
4 | of California.

5 |     43.    Upon information and belief, Defendants have databases, and/or other documentation, of
6 | its customers' transactions and account enrollment. These databases and/or documents can be analyzed
7 | by an expert to ascertain which of BCU's customers have been harmed by its practices and thus qualify
8 | as Class members. Further, the Class definitions identify groups of unnamed plaintiffs by describing a
9 | set of common characteristics sufficient to allow a member of that group to identify himself or herself as
10 | having a right to recover. Other than by direct notice by mail or email, alternatively proper and
11 | sufficient notice of this action may be provided to the Class members through notice published in
12 | newspapers or other publications.

13 |     44.    **Commonality (Federal Rule of Civil Procedure 23(a)(2)**– This action involves
14 | common questions of law and fact. The questions of law and fact common to both Plaintiff and the
15 | Class members include, but are not limited to, the following:

16 |     a.    Whether, pursuant to the Opt-In Agreement, Defendant promised to
17 | Plaintiff and the Class members that it would not charge an overdraft fee if there was
18 | enough money in the account to cover the transaction.;

19 |     b.    Whether Defendant breached the Opt-In Agreement by assessing overdraft
20 | fees for transactions when customers' checking accounts contained enough money to
21 | cover the transactions;

22 |     c.    Whether the language in the opt-in agreement-- "An overdraft occurs
23 | when you do not have enough money in your account to cover a transaction, but we pay it
24 | anyway."--described Defendant's overdraft service pursuant to which Defendant assessed
25 | overdraft fees using an available-balance method instead of a ledger-balance method.

26 |     d.    Whether Defendant is liable under claims of breach of the covenant of
27 | good faith and fair dealing, unjust enrichment and money had and received;

28 |     e.    Whether Defendant's conduct violated state consumer protection laws;

12

1  and

2  f.  Whether Defendant's conduct violated 12 C.F.R. § 1005.17.

3  45.  **Typicality (Federal Rule of Civil Procedure 23(a)(3))** – Plaintiff's claims are typical of

4  all of the members of the Class. The evidence and the legal theories regarding Defendant's alleged

5  wrongful conduct committed against Plaintiff and all of the Class members are substantially the same

6  because all of the relevant agreements between Defendant and its customers, including the Customer

7  Agreements, were identical as to all relevant terms, and also because the challenged practices of

8  charging customers for overdraft fees when there were sufficient funds in the accounts to pay for the

9  transactions at issue, are uniform for Plaintiff and all Class members. Accordingly, in pursuing her own

10  self-interest in litigating her claims, Plaintiff will also serve the interests of the other Class members.

11  46.  **Adequacy (Federal Rule of Civil Procedure 23(a)(4))** – Plaintiff will fairly and

12  adequately protect the interests of the Class members. Plaintiff has retained competent counsel

13  experienced in class action litigation to ensure such protection. There are no material conflicts between

14  the claims of the representative Plaintiff and the members of the Class that would make class

15  certification inappropriate. Plaintiff and her counsel intend to prosecute this action vigorously.

16  47.  **Predominance and Superiority (Federal Rule of Civil Procedure 23(b)(3))** – The

17  matter is properly maintained as a class action under Rule 23(b)(3) because the common questions of

18  law or fact identified herein and to be identified through discovery predominate over questions that may

19  affect only individual Class members. Further, the class action is superior to all other available methods

20  for the fair and efficient adjudication of this matter. Because the injuries suffered by the individual

21  Class members are relatively small, the expense and burden of individual litigation would make it

22  virtually impossible for Plaintiff and Class members to individually seek redress for Defendant's

23  wrongful conduct. Even if any individual person or group(s) of Class members could afford individual

24  litigation, it would be unduly burdensome to the courts in which the individual litigation would proceed.

25  The class action device is preferable to individual litigation because it provides the benefits of unitary

26  adjudication, economies of scale, and comprehensive adjudication by a single court. In contrast, the

27  prosecution of separate actions by individual Class members would create a risk of inconsistent or

28  varying adjudications with respect to individual Class members that would establish incompatible

13

1    standards of conduct for the party (or parties) opposing the Class and would lead to repetitious trials of

2    the numerous common questions of fact and law.  Plaintiff knows of no difficulty that will be

3    encountered in the management of this litigation that would preclude its maintenance as a class action.

4    As a result, a class action is superior to other available methods for the fair and efficient adjudication of

5    this controversy.  Absent a class action, Plaintiff and the Class members will continue to suffer losses,

6    thereby allowing Defendant's violations of law to proceed without remedy and allowing Defendant to

7    retain the proceeds of their ill-gotten gains.

8        48.    Plaintiff is not aware of any separate litigation instituted by any of the class members

9    against Defendant.  Plaintiff does not believe that any other Class members' interest in individually

10   controlling a separate action is significant, in that Plaintiff has demonstrated above that her claims are

11   typical of the other Class members and that she will adequately represent the Class.  This particular

12   forum is a desirable forum for this litigation because Plaintiff resides in Hayward, California, Defendant

13   operates a branch office in Fremont, California, and the claims arose from activities which occurred in

14   Alameda County, California.  Plaintiff does not foresee significant difficulties in managing the class

15   action in that the major issues in dispute are susceptible to class proof.

16       49.    Plaintiff anticipates the issuance of notice, setting forth the subject and nature of the

17   instant action, to the proposed Class members.  Upon information and belief, Defendant's own business

18   records and/or electronic media can be utilized for the contemplated notices.  To the extent that any

19   further notices may be required, Plaintiff anticipates the use of additional media and/or mailings.

20       50.    This matter is properly maintained as a class action pursuant to Rule 23(b) of the Federal

21   Rules of Civil Procedure, in that:

22           a.  Without class certification and determination of declaratory, injunctive, statutory and

23               other legal questions within the Class format, prosecution of separate actions by

24               individual members of the Class will create the risk of:

25                   1.  Inconsistent or varying adjudications with respect to individual members

26                       of the Class which would establish incompatible standards of conduct for

27                       the parties opposing the Class; or

28                   2.  Adjudication with respect to individual members of the Class, which

14

would as a practical matter be dispositive of the interests of the other members not parties to the adjudication or substantially impair or impede their ability to protect their interests. The parties opposing the Class have acted or refused to act on grounds generally applicable to each member of the Class, thereby making appropriate final injunctive or corresponding declaratory relief with respect to the Class as a whole.

   b.  Common questions of law and fact exist as to the members of the Class and predominate over any questions affecting only individual members, and a class action is superior to other available methods of the fair and efficient adjudication of the controversy, including consideration of:

       1.  The interests of the members of the Class in individually controlling the prosecution or defense of separate actions;

       2.  The extent and nature of any litigation concerning controversy already commenced by or against members of the Class;

       3.  The desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

       4.  The difficulties likely to be encountered in the management of a class action.

## FIRST CAUSE OF ACTION

### (Breach of Contract)

51.    The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

52.    Plaintiff and each of the Class members entered into a contract with Defendant covering the subject of overdraft transactions, which has been identified herein as the Opt-In Agreement. This contract was drafted by and is binding upon Defendant.

53.    In the contract, Defendant promised that BCU would assess overdraft fees only when there was not enough money in the account to cover the transaction.

54.    The contract incorporated by reference all applicable laws regarding its subject matter,

15

including 12 C.F.R. § 1005.17, which mandates that all opt-in agreements for assessing overdraft fees for ATM and non-recurring debit card transactions be separate from the account agreement and accurately describe the overdraft fee practice, and bars financial institutions from assessing fees for non-recurring debit card and ATM transactions if they have not fully complied with that section's requirements.

55.     Plaintiff and the Class members have performed all conditions, covenants, and promises required by each of them on their part to be performed in accordance with the terms and conditions of the contract, except for those they were prevented from performing or which were waived or excused by Defendant's misconduct.

56.     Defendant breached the express terms of the contract by, inter alia, assessing overdraft fees when there was money in the account to cover the transaction or transactions at issue.

57.     As a proximate result of Defendant's breach of the contract, Plaintiff and the Class members have been damaged in an amount to be proven at trial and seek relief as set forth in the Prayer below.

## SECOND CAUSE OF ACTION

### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

58.     The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

59.     Plaintiff and each of the Class members entered into a contract with Defendant covering the subject of overdraft transactions, which has been identified herein as the Opt-In Agreement. This contract was drafted by and is binding upon Defendant.

60.     In the contract, Defendant promised that BCU would assess overdraft fees for ATM and debit card transactions only when there was not enough money in the account to cover the transaction.

61.     The contract incorporated by reference all applicable laws regarding its subject matter, including 12 C.F.R. § 1005.17, which mandates that the opt-in agreement for assessing overdraft fees for ATM and non-recurring debit card transactions be separate from the account agreement and accurately describe the overdraft fee practice.

62.     Further, good faith is an element of every contract pertaining to the assessment of

16

1  overdraft fees.  Whether by common law or statute, all such contracts impose upon each party a duty of

2  good faith and fair dealing.  Good faith and fair dealing, in connection with executing contracts and

3  discharging performance and other duties according to their terms, means preserving the spirit—not

4  merely the letter—of the bargain.  Thus, the parties to a contract are mutually obligated to comply with

5  the substance of their contract in addition to its form.  Evading the spirit of the bargain and abusing the

6  power to specify terms, constitute examples of bad faith in the performance of contracts.

7       63.     The material terms of the contract also included the implied covenant of good faith and

8  fair dealing, whereby Defendant covenanted that it would, in good faith and in the exercise of fair

9  dealing, deal with Plaintiff and each Class member fairly and honestly and do nothing to impair,

10  interfere with, hinder, or potentially injure Plaintiff's and the Class members' rights and benefits under

11  the contract.

12       64.     Plaintiff and the Class members have performed all conditions, covenants, and promises

13  required by each of them on their part to be performed in accordance with the terms and conditions of

14  the contract, except for those they were prevented from performing or which were waived or excused by

15  Defendant's misconduct.

16       65.     Defendant breached the implied covenant of good faith and fair dealing based on its

17  practices of assessing fees when there was enough money in the account to cover the transaction, failing

18  to provide an accurate agreement of its overdraft program for non-recurring debit and ATM transactions,

19  and failing to permit its customers to choose whether to opt-in to the overdraft program for non-

20  recurring debit and ATM transactions.  In so doing, Defendant executed a contractual obligation in bad

21  faith, depriving Plaintiff and the Class members of the full benefit of the contract.

22       66.     As a proximate result of Defendant's breach of the implied covenant of good faith and

23  fair dealing, Plaintiff and the Class members have been damaged in an amount to be proven at trial and

24  seek relief as set forth in the Prayer below.

25                                    **THIRD CAUSE OF ACTION**

26                                    **(Unjust Enrichment/Restitution)**

27       67.     The preceding allegations are incorporated by reference and re-alleged as if fully set forth

28  herein.

17

1    68.    As a result of the wrongful misconduct alleged above, Defendant unjustly received

2    millions of dollars in overdraft fees.

3    69.    The Consumer Finance Protection Bureau has concluded that inadequate disclosure of the

4    type of balance-calculation used to determine overdraft transactions and their resultant fees that create

5    additional overdraft fee harm constitutes an Unfair, Deceptive, or Abusive Acts or Practices.  (CFPB

6    Bulletin 2013-07[4], at p. 2 (defining Unfair, Deceptive, or Abusive Acts or Practices based on the FTC

7    balancing test: "1) It causes or is likely to cause substantial injury to consumers; 2) The injury is not

8    reasonably avoidable by consumers; and 3) The injury is not outweighed by countervailing benefits to

9    consumers or to competition"); CFPB Supervisory Highlights, Winter 2015, at p. 9 ("Furthermore,

10   because consumers were substantially injured or likely to be so injured by overdraft fees assessed

11   contrary to the overall net impression created by the disclosures (in a manner not outweighed by

12   countervailing benefits to consumers or competition), and because consumers could not reasonably

13   avoid the fees (given the misimpressions created by the disclosures), the practice of assessing the fees

14   under these circumstances was found to be unfair.").)

15   70.    Because Plaintiff and the Class members paid the erroneous overdraft fees assessed by

16   Defendant, Plaintiff and the Class members have conferred a benefit on Defendant, albeit undeservingly.

17   Defendant has knowledge of this benefit, as well as the wrongful circumstances under which it was

18   conveyed, and yet has voluntarily accepted and retained the benefit conferred.  Should it be allowed to

19   retain such funds, Defendant would be unjustly enriched.  Therefore, Plaintiff and the Class members

20   seek relief as set forth in the Prayer below.

21   **FOURTH CAUSE OF ACTION**

22   **(Money Had and Received)**

23   71.    The preceding allegations are incorporated by reference and re-alleged as if fully set forth

24   herein.

25   72.    Defendant has obtained money from Plaintiff and the Class members by the exercise of

26   undue influence, menace or threat, compulsion or duress, and/or mistake of law and/or fact.

27

28   [4] http://files.consumerfinance.gov/f/201307_cfpb_bulletin_unfair-deceptive-abusive-practices.pdf

18

CLASS ACTION COMPLAINT

1    73.    As a result, Defendant has in its possession money which, in equity, belongs to Plaintiff

2  and the Class members, and thus, this money should be refunded to Plaintiff and the Class members.

3  Therefore, Plaintiff and the Class members seek relief as set forth in the Prayer below.

4                               **FIFTH CAUSE OF ACTION**

5                **(Violation of Electronic Fund Transfers Act (Regulation E)**

6          **C.F.R. § 1005 et seq.  (authority derived from 15 U.S.C. § 1693 et seq.))**

7    74.    The preceding allegations are incorporated by reference and re-alleged as if fully set forth

8  herein.

9    75.    By charging overdraft fees on ATM and nonrecurring transactions, BCU violated the

10  UCL by violating Regulation E (12 C.F.R. §§1005 *et seq.*), whose "primary objective" is "the protection

11  of consumers" (§1005.1(b)) and which "carries out the purposes of the [Electronic Fund Transfer Act

12  (15 U.S.C. §§1693 *et seq.*), the "EFTA"] (§1005.1(b)), whose express "primary objective" is also "the

13  provision of individual consumer rights" (15 U.S.C. §1693(b)).

14    76.    Specifically, the charges violated what is known as the "Opt In Rule" of Reg E.  (12

15  C.F.R. §1005.17.)  The Opt In Rule states:  "a financial institution ... *shall not assess a fee or charge* ...

16  pursuant to the institution's overdraft service, *unless* the institution: (i) [p]rovides the consumer with a

17  notice in writing [the opt-in notice]... *describing the institution's overdraft service*"  and (ii) "[p]rovides

18  a reasonable opportunity for the consumer to *affirmatively consent*" to enter into the overdraft program

19  (*Id.*) a "shall be clear and readily understandable."  (12 C.F.R. §205.4(a)(1).)  To comply with the

20  affirmative consent requirement, a financial institution must provide segregated writing of its overdraft

21  practices that are accurate, non-misleading and truthful and that conforms to 12 C.F.R. § 1005.17 prior

22  to the opt-in, and must provide a reasonable opportunity to opt-in.  The affirmative consent must be

23  provided in a way mandated by 12 C.F.R. § 1005.17, and the financial institution must provide

24  confirmation of the opt-in in a manner that conforms to 12 C.F.R. § 1005.17.

25    77.    The intent and purpose of this opt-in notice is to "assist customers in understanding how

26  overdraft services provided by their institutions operate ....  by explaining the institution's overdraft

27  service ... in a clear and readily understandable way"—as stated in the Official Staff Commentary (74

28  Fed. Reg. 59033, 59035, 59037, 5940, 5948), which is "the CFPB's official interpretation of its own

19

1  regulation," "warrants deference from the courts unless `demonstrably irrational,'" and should therefore

2  be treated as "a definitive interpretation" of Reg E (Strubel v. Capital One Bank (USA), 2016 U.S.Dist.

3  LEXIS 41487, *11 (S.D. N.Y. 2016) (quoting Chase Bank USA v. McCoy, 562 U.S. 195, 211 (2011))

4  (so holding for the CFPB's Official Staff Commentary for the Truth In Lending Act's Reg Z).)

5      78.     The description of BCU's overdraft service in its opt-on agreement  did not describe its

6  actual overdraft service as required by Reg E.  The description states that an overdraft occurs "when you

7  do not have enough money in your account to cover a transaction."  This language, simply copy-and-

8  pasted from Reg E's Model Form A-9, describes an overdraft service where overdrafts are based on the

9  ledger-balance method (i.e., the actual balance) as opposed to the available-balance method actually

10 used by BCU.

11     79.     BCU failed to comply with Regulation E, 12 C.F.R. § 1005.17, which requires

12 affirmative consent before a financial institution is permitted to assess overdraft fees against customers'

13 accounts through an overdraft program for ATM and non-recurring debit card transactions.  BCU has

14 failed to comply with the 12 C.F.R. § 1005.17 opt-in requirements, including misstating its overdraft

15 practices in the overdraft notice in by stating that it would assess an overdraft fee only when there is not

16 enough money in the account to cover the transaction, when in actual practice, Defendant assesses

17 overdraft fees even when there is money in the account to cover the transaction.  Furthermore, upon

18 information and belief, Defendant failed to meet some or all of the other requirements of 12 C.F.R. §

19 1005.17 in obtaining opt-ins of its customers to enter the overdraft fee program.

20     80.     As a result of violating Regulation E's prohibition against assessing overdraft fees on

21 ATM and non-recurring debit card transactions, BCU has harmed Plaintiff and the Class.

22     81.     Due to BCU's violation of Regulation E (12 C.F.R. § 1005.17), Plaintiff and members of

23 the Class are entitled to actual and statutory damages, as well as attorneys' fees and costs of suit

24 pursuant to 15 U.S.C.A. § 1693m.

25                          **SIXTH CAUSE OF ACTION**

26                  **(For Violation of the Unfair Competition Law)**

27     82.     The preceding allegations are incorporated by reference and realleged as if fully set forth

28 herein.

83. Plaintiff, who has suffered injury in fact and has lost money or property as a result of Defendant's violations of the California Unfair Competition Law, Business and Professions Code §§ 17200 *et. seq.*, alleges this cause of action as a class action and as a private attorney general on behalf of the members of the general public.

84. Defendant has engaged in, and continues to engage in, a general business practice whereby it charges overdraft fees for transactions when there was money in the checking account to cover those transactions, and provides inaccurate information regarding this practice, failing to disclose its actual nature.

85. By engaging in the above-described practice and the actions and omissions herein alleged, Defendant has committed one or more acts of unfair competition within the meaning of California Business & Professions Code § 17200.

86. Defendant's practice is unlawful. It violates 12 C.F.R. § 1005.17 in at least three ways: first, by failing to provide an accurate statement of the terms of its overdraft program; second, by failing to obtain a legally valid consent from its customers to enter into the program based on accurate notice of its terms; and third, by charging overdraft fees for non-recurring debit card and ATM transactions without having provided the accurate notice required by 12 C.F.R. § 1005.17, and/or without having obtained a legally valid consent from its customers to enter into the program.

87. Defendant's practice also violates 12 C.F.R. § 707.4(b)(4) by failing to accurately state "[t]he amount of any fee that may be imposed in connection with the account (or an explanation of how the fee will be determined) and the conditions under which the fee may be imposed." Defendant's practice also violates 12 C.F.R. § 740.2 because Defendants have made inaccurate and deceptive representations in employing that practice.

88. Defendant's practice is also unfair since it has no utility and, even if it did, any utility is outweighed by the gravity of harm to Plaintiff and the Class members. Defendant's practice is also immoral, unethical, oppressive or unscrupulous and causes injury to consumers which outweighs its benefits. Defendant's practice is also unfair because it embodies a systematic breach of the Customer Agreements with all of Defendant's customers, and because it violates the implied covenants of good faith and fair dealing. Defendant's practice was set in place by Defendant via an automated system

1   whereby Defendant purposefully assesses fees which violate the Opt-In Agreement.  Further,

2   Defendant's practice contravenes express legislative policy, as set forth in 12 C.F.R. § 707.4(b)(4), 12

3   C.F.R. § 740.2, 12 C.F.R. § 1005.17, and other relevant statutes, regulations and comments.

4         89.     By reason of the foregoing, Defendant has been improperly and unjustly enriched to the

5   detriment of Plaintiff and the Class members in an amount to be proven at trial.  Plaintiff and the Class

6   members are entitled to have Defendant disgorge and restore to Plaintiff and the Class members all

7   monies wrongfully obtained by Defendant as a result of its conduct as alleged herein.

8         90.     Unless Defendant is enjoined from continuing to engage in this business practice,

9   Plaintiff and the Class members will continue to be injured by Defendant's wrongful actions and

10   conduct.  Therefore, Plaintiff and the Class members are entitled to injunctive relief.

11                                 **PRAYER**

12         WHEREFORE, Plaintiff and the Class pray for judgment as follows:

13         1.     For an order certifying this action as a class action;

14         2.     For compensatory damages on all applicable claims and in an amount to be proven at

15   trial;

16         3.     For an order requiring Defendant to disgorge, restore, and return all monies wrongfully

17   obtained together with interest calculated at the maximum legal rate;

18         4.     For an order enjoining the wrongful conduct alleged herein;

19         5.     For costs;

20         6.     For pre-judgment and post-judgment interest as provided by law;

21         7.     For attorneys' fees under the Electronic Fund Transfer Act, the common fund doctrine,

22   and all other applicable law; and

23   ///

24   ///

25   ///

26   ///

27   ///

28   ///

8.      For such other relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff and the Class members demand a trial by jury on all issues so triable.

DATED:  July 5, 2016                    MCCUNE WRIGHT LLP

                                         THE KICK LAW FIRM, APC


                                         BY:   _____
                                               MCCUNE WRIGHT LLP
                                               Richard D. McCune
                                               Jae "Eddie" K. Kim

                                               The Kick Law Firm, APC
                                               Taras Kick
                                               James Strenio
                                               Robert J. Dart

                                               Attorneys for Plaintiff
                                               Sondra Ramirez and the Putative Class