UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SONDRA RAMIREZ,<br><br>    Plaintiff,<br><br>    v.<br><br>BAXTER CREDIT UNION,<br><br>    Defendant. | Case No. 16-cv-03765-SI<br><br>**ORDER ON DEFENDANT'S MOTION TO DISMISS FIRST AMENDED COMPLAINT AND MOTION TO STRIKE CLASS ALLEGATIONS**<br><br>Re: Dkt. Nos. 48, 49 |

Before the Court are defendant's motions to dismiss plaintiff's first amended complaint and to strike plaintiff's class allegations, or in the alternative, to deny class certification. Dkt. Nos. 48, 49. Pursuant to Civil Local Rule 7-1(b), the Court determines that this matter is appropriate for resolution without oral argument and VACATES the hearing set for March 24, 2017. For the reasons set forth below, the Court DENIES defendant's motion to dismiss and GRANTS IN PART and DENIES IN PART defendant's motion to strike class allegations.

**BACKGROUND**

Plaintiff Sondra Ramirez ("Ramirez") filed this class action lawsuit on July 5, 2016, seeking damages and injunctive relief against defendant Baxter Credit Union ("BCU") in connection with BCU's overdraft charge policy. Compl. (Dkt. No. 1). On January 12, 2017, the Court granted BCU's motion to dismiss plaintiff's complaint, in part, with leave to amend. Dkt. No. 40. Ramirez filed an amended complaint against BCU, alleging the same six causes of action: (1) breach of contract; (2) breach of the implied covenant of good faith and fair dealing; (3) unjust enrichment/restitution; (4) money had and received; (5) violation of the Electronic Fund Transfer Act ("EFTA"); and (6) violation of California's Unfair Competition Law ("UCL"). First Am.

1    Compl. ("FAC") (Dkt. No. 46) ¶¶ 55-96.

2

3    **I.     Plaintiff's Allegations**

During the class period, Ramirez was a BCU member. FAC ¶ 5. When Ramirez opened her BCU checking account, she affirmatively opted in to BCU's overdraft protection, which BCU refers to as its "Courtesy Payment service." *See id.* ¶¶ 23, 37; *id.* Ex. 1, Membership Enrollment Form (Dkt. No. 46-1), at 1-2. Ramirez's Membership Enrollment Form included a federally mandated, separate opt-in provision with the heading "What You Need to Know About Overdraft Fees." FAC, Ex. 1 at 2.

The opt-in states that "[a]n <u>overdraft</u> occurs when you do not have enough money in your account to cover a transaction, but [BCU] pay[s] it anyway." *Id.* (emphasis in original). It further describes the credit union's Courtesy Payment service, explaining that BCU automatically authorizes and pays overdrafts for certain transactions, including checks and automatic bill payments. *Id.* The opt-in notes that BCU "does <u>not</u> authorize and pay overdrafts for" ATM transactions and one-time debit card transactions, unless the applicant opts in immediately below. *Id.* (emphasis in original). The opt-in describes the amount of fees BCU charges for overdrafts ($29 per overdraft), but does not describe how the credit union calculates a member's balance for purposes of determining whether she has overdrafted her account. *See id.* Ramirez alleges that the overdraft opt-in does not accurately describe BCU's actual overdraft service. FAC ¶¶ 22-23, 25, 27.

When she opened her account, Ramirez and her joint applicant opted in to the Courtesy Payment service for ATM and one-time debit card transactions by checking the box beside "I **do** want [BCU] to authorize and pay overdrafts on my ATM and one-time (individual, not recurring) Debit Card transactions." *Id.* (emphasis in original). The two signed the Membership Enrollment Form just below the opt-in provision. *Id.* In the signature block, the form states that "[b]y signing below you acknowledge that you have received and agreed to the terms and conditions contained on both sides of this form and in the Deposit Account Agreement, which includes . . . Fee disclosures . . . ." *Id.*

2

The Deposit Account Agreement, attached as Exhibit 2 to plaintiff's first amended complaint, is a 33-page document containing detailed disclosures regarding the rights and responsibilities of Ramirez and BCU with respect to Ramirez's account. *See* FAC, Ex. 2 (Dkt. No. 46-2). Ramirez alleges that the Deposit Account Agreement also fails to accurately describe BCU's overdraft service. *Id.* ¶¶ 24-25, 27. While BCU's Courtesy Payment service is not identified in the account agreement table of contents, it is described in some detail under the section entitled "Your Checking Account." *See* FAC, Ex. 2, Table of Contents; *id.* at 11. In brief, the Courtesy Payment service disclosure first explains eligibility criteria for the service, and then describes how the service functions. *See id.* The agreement provides, in relevant part:

> Courtesy Payment may be granted that will allow you to overdraw the available funds in your Account. We pay overdrafts at our discretion, which means we do not guarantee that we will always authorize and pay any type of transaction. Our Courtesy Payment service will attempt to pay, when possible, checks, [Automated Clearing House transfers], and recurring Debit Card purchases presented against insufficient available funds in your account. . . .
>
> [¶]
>
> Our current service charge is $29 for each overdraft. A Courtesy Payment service charge will not be charged for any transaction that brings the available balance in your account negative by $5 or less. A Courtesy Payment service charge per each occurrence that results in the available balance in your account becoming negative by more than $5 will be charged to your account as stated in the Product Feature, Truth-In-Savings and Service Charge and Fee disclosures. There is no limit to the number of service charges that can be charged for overdrawing the available balance in your account. . . .

*Id.* The agreement contains "Funds Availability Disclosures" that describe when deposited funds become "available." *See id.* at 22-23. The agreement also describes that, when a customer uses her Visa Debit Card to make purchases, funds to cover those purchases "will be deducted from [the] checking account. If the balance in [the] account is not sufficient to pay the transaction amount, [BCU] may treat the transaction as an overdraft request pursuant to [the] Courtesy Payment program . . . ." *Id.* at 23. The last page of the Deposit Account Agreement is the "Service Charge and Fee Schedule," which lists the $29 "Courtesy Payment service charge (each transaction that results in the available balance in the account being negative by more than $5)."

3

1  *Id.* at 33.  The agreement also contains nearly a full page of definitions.  *Id.* at 1-2.  Nowhere,

2  however, does the Deposit Account Agreement define "available balance" or describe how it is

3  calculated.

4        Ramirez alleges that on January 16, 2016, she had a positive balance of $347.86 in her

5  checking account.  FAC ¶ 37.  When Ramirez bought something for $60.97 with her debit card,

6  BCU assessed an overdraft fee against her account.  *Id.*  Plaintiff alleges that this is but one

7  example of an ongoing course of conduct.  *See id.* ¶¶ 37, 40.

8        This dispute, and others like it, hinge on how a financial institution calculates account

9  balances when determining whether an overdraft has occurred, and whether the institution

10 adequately informs accountholders of these overdraft practices.  A checking account has two

11 balances: a "ledger" balance (or "actual" balance), which represents the official account balance at

12 any given time, and an "available" balance, which represents the funds immediately available to

13 the accountholder.  *See id.* ¶ 26.  Sometimes these two balances are the same, but often they are

14 not.  For instance, when an accountholder deposits a check, banks generally make only a portion

15 of that check available immediately, with the remainder held for a certain time period while the

16 funds clear.  *See id.*  The account's ledger balance might reflect the full amount of the deposit right

17 away, but the available balance would include only a portion of that check deposit until the check

18 clears.  Or, as another example, when an accountholder uses his or her debit card to make a

19 purchase in a store or online, the merchant might place a "credit hold" on those funds, with the

20 actual debit against the account occurring one or two days later when the transaction settles.  *See*

21 *id.*  The account's ledger balance does not reflect such a transaction until it settles, but the

22 available balance reflects the transaction immediately.

23       Ramirez alleges that, based on the opt-in language in her Membership Enrollment Form

24 and the disclosures in the Deposit Account Agreement, BCU promised to use a member's ledger

25 balance to determine when an overdraft occurs, when in actuality, the credit union uses a

26 member's available balance.  *Id.* ¶¶ 25-27.  As a result, an accountholder may inadvertently

27 overdraft his or her account, and do so repeatedly, by relying on the ledger balance.  Ramirez

28 alleges that by misleading its members in this manner, BCU has violated the EFTA provisions

4

governing overdrafts and breached the terms of the opt-in form and the Deposit Account Agreement (together, the "Customer Agreements").

## II. Class Allegations

Plaintiff brings this case on behalf of two separate classes, the "Positive Balance Class" and the "Regulation E Class." *See* FAC ¶¶ 42-43. The "Positive Balance Class" is defined as "[a]ll United States residents who have or have had accounts with BCU who incurred overdraft fees when the ledger balance in the checking account was sufficient to cover the transactions in the four years preceding the filing of this Complaint." *Id.* ¶ 43. The "Regulation E Class" is defined as "[a]ll United States residents who have or have had accounts with BCU who incurred overdraft fee(s) for ATM or non-recurring debit card transactions since August 15, 2010." *Id.*

## LEGAL STANDARD

### I. Motion to Dismiss for Failure to State a Claim

To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). This "facial plausibility" standard requires the plaintiff to allege facts that add up to "more than a sheer possibility that a Defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). While courts do not require "heightened fact pleading of specifics," a plaintiff must allege facts sufficient to "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555, 570. "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (quoting *Twombly*, 550 U.S. at 557). "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id.* at 679.

In reviewing a Rule 12(b)(6) motion, a district court must accept as true all facts alleged in the complaint, and draw all reasonable inferences in favor of the plaintiff. *See al-Kidd v. Ashcroft*,

580 F.3d 949, 956 (9th Cir. 2009). However, a district court is not required to accept as true "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008). As a general rule, the Court may not consider any materials beyond the pleadings when ruling on a Rule 12(b)(6) motion. *Lee v. City of L.A.*, 250 F.3d 668, 688 (9th Cir. 2001). However, pursuant to Federal Rule of Evidence 201, the Court may take judicial notice of "matters of public record," such as prior court proceedings. *Id*. at 688-89. The court may also consider "documents attached to the complaint [and] documents incorporated by reference in the complaint . . . without converting the motion to dismiss into a motion for summary judgment." *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003).

## II.     Motion to Strike

A court may strike "from a pleading an insufficient defense or any redundant, immaterial, impertinent or scandalous matter." Fed. R. Civ. P. 12(f). "Whether to grant a motion to strike lies within the sound discretion of the district court." *Mayfield v. Cty. of Merced*, No. 13-1619, 2015 WL 791309, at *3 (E.D. Cal. Feb. 25, 2015). "Motions to strike are regarded with disfavor, as they are often used as delaying tactics, and should not be granted unless it is clear that the matter to be stricken could have no possible bearing on the subject matter of the litigation." *Brown v. Hain Celestial Grp., Inc.*, 913 F. Supp. 2d 881, 888 (N.D. Cal. 2012) (citation and internal quotation marks omitted). "Before a motion to strike is granted, the court must be convinced that any questions of law are clear and not in dispute, and that under no set of circumstances could the claim or defense succeed." *Sanders v. Apple Inc.*, 672 F. Supp. 2d 978, 990 (N.D. Cal. 2009) (citation omitted). "When considering a motion to strike, a court must view the pleadings in a light most favorable to the non-moving party." *Brown*, 913 F. Supp. 2d at 888.

## DISCUSSION

## I.     Motion to Dismiss

Plaintiff alleges six causes of action: (1) breach of contract; (2) breach of the implied

1   covenant of good faith and fair dealing; (3) unjust enrichment/restitution; (4) money had and
2   received; (5) violation of the EFTA (Regulation E); and (6) violation of California's Unfair
3   Competition Law.  Defendant moves to dismiss plaintiff's first, second, third, fourth, and sixth
4   causes of action.  For the reasons set forth below, the Court DENIES defendant's motion to
5   dismiss.

### A. Breach of Contract

Plaintiff's first claim is for breach of contract.  Plaintiff alleges that defendant breached the Customer Agreements by charging overdraft fees based on her available account balance rather than her ledger balance.  Defendant argues that plaintiff's contract claim fails because the Deposit Account Agreement plainly states that overdraft fees will be assessed based on a member's "available balance."

The parties apparently agree that Illinois law should govern plaintiff's contract claim by virtue of the choice of law provision contained in the Deposit Account Agreement.  *See* Pl.'s Opp'n to MTD (Dkt. No. 53) at 7, 17-18.  In Illinois, "where different instruments are executed together as part of one transaction or agreement, they are to be read together and construed as constituting but a single instrument."  *Pecora v. Szabo*, 94 Ill. App. 3d 57, 63 (1981) (citation omitted).  Accordingly, the Court reads the Customer Agreements as a single instrument in order to determine whether plaintiff states a plausible claim for breach of contract.

The elements of a breach of contract claim under Illinois law are: (1) the existence of a valid and enforceable contract; (2) plaintiff's performance; (3) defendant's breach; and (4) resulting damages to the plaintiff.  *Catania v. Local 4250/5050 of Communications Workers of Am.*, 359 Ill. App. 3d 718, 724 (2005) (citation and internal quotation marks omitted).

Defendant argues that the Court should dismiss plaintiff's breach of contract claim because, under the terms of the Customer Agreements, it committed no breach.  Def.'s MTD at 9.  Defendant argues that the Deposit Account Agreement clearly states that overdrafts will be assessed based on a customer's "available balance."  *Id.*  Plaintiff argues that the Customer Agreements do not adequately explain what a customer's "available balance" is with respect to

1  overdrafts, and thus the agreements should be interpreted as promising to assess overdrafts based
2  on the customer's ledger balance. Pl.'s Opp'n to MTD at 8-11.

3  "If the language of an alleged contract is ambiguous regarding the parties' intent, the
4  interpretation of the language is a question of fact which a [] court cannot properly determine on a
5  motion to dismiss." *Quake Const., Inc. v. Am. Airlines, Inc.*, 141 Ill. 2d 281, 288-89 (1990). "The
6  presence of an ambiguity in a document is a question of law; an ambiguity exists if words used
7  can be interpreted in more than one sense." *Srivastava v. Russell's Barbecue, Inc.*, 168 Ill. App.
8  3d 726, 732 (1988); *see Bank of Am. Nat. Trust & Sav. Ass'n v. Schulson*, 305 Ill. App. 3d 941,
9  945–46 (1999), *as modified on denial of reh'g* (June 30, 1999) ("A contract is ambiguous if it is
10 susceptible to more than one reasonable interpretation."). "[A] contract is not ambiguous simply
11 because the parties disagree as to its meaning," but if the parties assert "opposing reasonable
12 interpretations," a court should find the agreement ambiguous. *Zwayer v. Ford Motor Credit Co.*,
13 279 Ill. App. 3d 906, 910 (1996). In order to state a claim, the Customer Agreements must be
14 "reasonably susceptible" to plaintiff's interpretation. *See In re Estate of Chaitlen*, 179 Ill. App. 3d
15 287, 291 (1989).

16 For example, in *Zwayer*, the parties disputed the interpretation of the plaintiff's retail
17 installment form contract. 279 Ill. App. 3d at 909-10. Specifically, the parties disagreed as to
18 whether the contract provided for use of the "actuarial method" or the "sum-of-the-digits method"
19 in calculating a refund upon acceleration of the plaintiff's loan. *Id.* The appellate court found that
20 the contract was susceptible to more than one interpretation because, among other reasons, it
21 "lack[ed] any provision specifying which method [would] be employed in calculating the refund
22 upon acceleration." *Id.* at 910. Accordingly, the court affirmed the trial court's partial denial of
23 the defendant's motion to dismiss.

24 Here, the Customer Agreements contain no provision specifying which method BCU uses
25 to determine a customer's balance for assessing overdrafts. Both parties put forth reasonable,
26 opposing interpretations of the agreement. Defendant reasonably asserts that the Deposit Account
27 Agreement's repeated use of "available balance," plus other contractual hints that the "available
28 balance" is some subset of a customer's ledger balance, demonstrates that BCU does not use a

customer's ledger balance in assessing overdrafts. Plaintiff reasonably asserts that the agreement fails to define "available balance," or otherwise clearly indicate to a customer that her "available balance" is somehow different from her ledger balance. The Court cannot resolve this ambiguity on a motion to dismiss.[1] *See Quake Const., Inc.*, 141 Ill. 2d at 288-89. Accordingly, defendant's motion to dismiss plaintiff's breach of contract claim is DENIED.

### B.  California Unfair Competition Law

Plaintiff's sixth cause of action is for violation of California's Unfair Competition Law ("UCL"), Cal. Bus. & Profs. Code § 17200, *et seq*. Plaintiff's UCL claim stems from the same course of conduct. She alleges that BCU unfairly assessed overdraft fees despite her account's sufficient ledger balance and that BCU failed to provide members with accurate information regarding its overdraft practices. *See* FAC ¶¶ 89-96.

The parties dispute whether plaintiff's UCL claim is appropriate in light of an Illinois choice-of-law provision in the Deposit Account Agreement. Plaintiff argues that she can bring a UCL claim because the choice of law provision only concerns actions arising in contract, not actions arising in tort. Pl.'s Opp'n to MTD at 16-18. Plaintiff further argues that the choice of law provision should not be enforced because it is contrary to a fundamental policy of California. *Id.* at 18-19 (citing *Nedlloyd Lines B.V. v. Superior Court*, 3 Cal. 4th 459, 464-66 (1992)). Defendant argues that the choice-of-law provision governs all claims arising from plaintiff's "membership, accounts and services," and therefore operates to exclude a California UCL claim. Def.'s Reply at 11-12.

The choice of law provision in the parties' Deposit Account Agreement provides as

---

[1] Defendant urges the Court to follow the U.S. District Court for the District of Columbia, which found, in construing a similar opt-in form and account agreement, that the plaintiff failed to state a breach of contract claim. *See Chambers v. NASA Fed. Credit Union*, No. 15-cv-2013-JDB, 2016 WL 6155930, at *5-6 (D.D.C. Oct. 21, 2016). While indeed similar, the opt-in form in *Chambers* conspicuously described when a customer might not have "enough money in her account" to cover a transaction. *See id.* at *5 ("[S]uch as when she 'inadvertently miscalculates her available balance,' or 'when funds from a recent deposit are not available.'"). Here, the Customer Agreements fail to provide such a conspicuous explanation of when a customer might have insufficient available funds to draw upon. As such, the Court finds defendant's non-binding authority distinguishable.

follows:

> While your membership, accounts and services are primarily governed by the Membership Application and this Deposit Account Agreement, they are also governed by the applicable law of the state in which the branch or service center where you opened your account is located, or if you opened your account by mail, or our services that can be accessed online, the law of the State of Illinois, federal law, federal reserve regulations and operating letters, clearing house rules and the recognized Credit Union practices used in the areas our Credit Union serves, as amended from time to time.

FAC Ex. 2, Deposit Account Agreement at 21-22.

Plaintiff first contends that the above provision, which applies to her "membership, accounts and services," does not apply to tort claims, such as her UCL claim. In federal question actions where the federal court exercises supplemental jurisdiction over state claims, choice of law issues are resolved by applying the choice of law principles of the forum state – here, California. *Paracor Finance, Inc. v. General Elec. Capital Corp.*, 96 F.3d 1151, 1164 (9th Cir. 1996); *see also Atl. Marine Const. Co. v. U.S. Dist. Court for W. Dist. of Texas*, 134 S. Ct. 568, 582 (2013) (applying same rule for diversity actions). In California, a "valid choice-of-law clause, which provides that a specified body of law 'governs' the 'agreement' between the parties, encompasses all causes of action arising from or related to that agreement, regardless of how they are characterized, including tortious breaches of duties emanating from the agreement or the legal relationships it creates." *Nedlloyd*, 3 Cal. 4th at 470; *but see Sutter Home Winery, Inc. v. Vintage Selections, Ltd.*, 971 F.2d 401, 407 (9th Cir. 1992) (citations omitted) ("Claims arising in tort are not ordinarily controlled by a contractual choice of law provision. . . . Rather, they are decided according to the law of the forum state."). The Court finds that the choice of law provision at issue, if valid, is sufficiently broad to apply to plaintiff's UCL claim. While a more narrowly drafted choice of law provision might exclude a tort claim under the UCL, the provision here governs not just contract interpretation, but plaintiff's "membership, accounts and services." Moreover, plaintiff's UCL claim relies on many of the same allegations as her breach of contract claim – that defendant's business practice of charging overdraft fees, and its providing inaccurate information to consumers regarding those practices, is an act of unfair competition. *See* FAC ¶¶ 89-90.

10

Whether the provision is enforceable is another question. Under *Nedlloyd*, the Court must first determine whether either: (1) Illinois "has a substantial relationship to the parties or their transaction," or (2) "there is any other reasonable basis for the parties' choice of [Illinois] law." 3 Cal. 4th at 466. If the Court answers both in the negative, the inquiry ends and the choice of law provision is unenforceable. *Id.* If the Court answers either in the affirmative, it must determine whether application of Illinois law is "contrary to a fundamental policy of California." *Id.* If such a conflict exists, the Court then decides whether California has a "materially greater interest than" Illinois in determining the issue. *Id.*

Assuming a reasonable basis for the choice of Illinois law,[2] plaintiff cites no authority that Illinois unfair competition law operates "contrary to a fundamental policy of California." However, at this stage, "the record with respect to balancing the competing states' interests is not sufficiently developed." *Bias v. Wells Fargo & Co.*, 942 F. Supp. 2d 915, 928 (N.D. Cal. 2013). Such analysis is "premature[] when dealing with a potential nationwide class action." *Id.* "Ultimately, Plaintiffs will bear the burden of establishing whether issues relating to choice of law can survive the test for class certification." *Id.*

Defendant does not suggest that plaintiff's UCL claim is insufficiently pled; only that it is barred by virtue of the choice of law provision in the Deposit Account Agreement. Having determined that the choice of law provision, at this stage, does not bar plaintiff's UCL claim, the Court therefore DENIES defendant's motion to dismiss this cause of action, without prejudice to its raising similar arguments at a later stage.

### C.     Other State Law Claims

Defendant argues, in essence, that plaintiff's remaining state law causes of action rise and fall with her breach of contract claim. Because plaintiff has sufficiently pled her breach of contract claim, defendant's motion to dismiss her remaining state law claims is DENIED.

---

[2] The choice of Illinois law is not a stretch given that Illinois is BCU's principal place of business. *See* Def.'s Reply (Dkt. No. 56) at 12.

## II.     Motion to Strike/Deny Class Certification

Defendant separately moves to strike plaintiff's Regulation E class allegations or to deny class certification. Def.'s Mt. to Strike (Dkt. No. 49). Defendant argues that plaintiff's proposed six-year class period is impermissibly broad based on the EFTA's one-year statute of limitations. *See* 15 U.S.C. § 1693m(g). Defendant further argues that the Court should strike allegations from plaintiff's complaint that BCU violated Regulation E by "failing to segregate" its opt-in form.

### A.     Regulation E Class

An action under Regulation E "may be brought . . . within one year from the date of the occurrence of the violation." 15 U.S.C. § 1693m(g). Plaintiff's complaint defines the Regulation E class as "United States residents who . . . incurred overdraft fee(s) . . . since August 15, 2010." FAC ¶ 43. Defendant argues that plaintiff's Regulation E class definition is "fatally flawed," as the class period is six years and claims under Regulation E are subject to a one-year statute of limitations. Def.'s Mot. to Strike at 1, 4-10. Defendant argues that additional discovery "will do nothing but cost the parties time and resources" without benefit. *Id.* at 4. Plaintiff argues that defendant's motion is premature and that, regardless, the discovery rule applies to permit a longer class period. Pl.'s Opp'n to Mot. to Strike (Dkt. No. 54) at 4-9.

Class allegations may be stricken before discovery is completed. *See Kamm v. Cal. City Dev. Co.*, 509 F.2d 205, 210 (9th Cir. 1975) (footnote omitted) ("The propriety of a class action cannot be determined in some cases without discovery, as for example, where discovery is necessary to determine the existence of a class or set of subclasses. . . . Where the necessary factual issues may be resolved without discovery, it is not required."); *Sanders*, 672 F. Supp. 2d at 990 (citation omitted) ("Where the complaint demonstrates that a class action cannot be maintained on the facts alleged, a defendant may move to strike class allegations prior to discovery."). However, while courts may occasionally dismiss class allegations early on, "it is in fact rare to do so in advance of a motion for class certification." *Cholakyan v. Mercedes-Benz USA, LLC*, 796 F. Supp. 2d 1220, 1245 (C.D. Cal. 2011) (collecting authority). Even where "plaintiffs' class definitions are suspicious and may in fact be improper, plaintiffs should at least

be given the opportunity to make the case for certification based on appropriate discovery . . . ." *In re Wal-Mart Stores, Inc. Wage & Hour Litig.*, 505 F. Supp. 2d 609, 615-16 (N.D. Cal. 2007).

A proposed class period dating back to August 15, 2010 for a cause of action with a one-year limitations period is facially invalid, absent any allegations which would extend the one-year period by discovery, equitable tolling or otherwise. *See, e.g.*, *Henson v. Fidelity Nat. Financial, Inc.*, 300 F.R.D. 413, 420-21 (C.D. Cal. 2014) (denying plaintiff's motion for class certification, among other reasons, because plaintiffs' class definition "include[d] almost fifteen years' worth of potential class members—far more than RESPA's slim one-year statute of limitations."); *see also Shabaz v. Polo Ralph Lauren Corp.*, 586 F. Supp. 2d 1205, 1211 (C.D. Cal. 2008) (striking class allegations of unlawful conduct outside of applicable one-year limitations period). Accordingly, defendant's motion to strike plaintiff's Regulation E class allegations, to the extent that they encompass a time period in excess of one year prior to filing of this action, is GRANTED at this time.

### B.     Failure to Segregate

Defendant asks the Court to strike allegations in plaintiff's complaint that it failed to segregate or improperly embedded the opt-in form in the Membership Enrollment Form. Def.'s Mot. to Strike at 11-14. In essence, defendant asks the Court to hold that, as a matter of law, the overdraft opt-in provisions in its Membership Enrollment Forms are sufficiently "segregated from all other information" as required under Regulation E, 12 C.F.R. § 1005.17(b)(i). Plaintiff argues that by embedding the opt-in form within the two-page Membership Enrollment Form, defendant violated the segregation requirement. "[B]ecause of the limited importance of pleadings in federal practice," the Court regards this motion to strike "with disfavor." *Smith v. Levine Leichtman Capital Partners, Inc.*, 723 F. Supp. 2d 1205, 1212 (N.D. Cal. 2010).

Each party argues that the commentary under 12 C.F.R. § 1005.17 supports its position regarding proper segregation of BCU's overdraft opt-in form. Both parties cite Comment 17(b)-6, which provides, in relevant part:

> A consumer's affirmative consent, or opt-in, to a financial

13

> institution's overdraft service must be obtained separately from other consents or acknowledgements obtained by the institution . . . . An institution may obtain a consumer's affirmative consent by providing a blank signature line or check box that the consumer could sign or select to affirmatively consent, provided that the signature line or check box is used solely for purposes of evidencing the consumer's choice whether or not to opt into the overdraft service and not for other purposes.

12 C.F.R. § 1005.17, cmt. 17(b)-6. Plaintiff argues that the opt-in was not "obtained separately from other consents or acknowledgements," because it was included in her two-page Membership Enrollment Form. Pl.'s Opp'n to Mot. to Strike at 10. Defendant argues that because it "obtain[ed] plaintiff's] affirmative consent by providing a . . . check box . . . used solely for purposes of evidencing [plaintiff's] choice whether or not to opt into the overdraft service," it satisfied the segregation requirement. In this controverted situation, a finding in the defendant's favor or is inappropriate on the pleadings alone. *See Sanders*, 672 F. Supp. 2d at 990 (citation omitted) ("Before a motion to strike is granted, the court must be convinced that . . . under no set of circumstances could the claim or defense succeed."). Defendant's motion to strike this allegation is DENIED.

## CONCLUSION

For the foregoing reasons, defendant's motion to dismiss is DENIED, and its motion to strike is DENIED IN PART and GRANTED IN PART.

This order resolves Dkt. Nos. 48, 49.

**IT IS SO ORDERED**.

Dated: March 21, 2017

_____
SUSAN ILLSTON
United States District Judge